# TAB D

5/25/2018 2:53 PM
Chris Daniel - District Clerk Harris County
Envelope No. 24873741
By: Walter Eldridge
Filed: 5/25/2018 2:53 PM

NO. _____

| | | |
|---|---|---|
| ABSOLUTE COLOR, LTD. | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | HARRIS COUNTY, TEXAS |
| | § | |
| XEIKON AMERICA, INC. | § | _____ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

Plaintiff, ABSOLUTE COLOR, LTD., files this Original Petition complaining of Defendant, XEIKON AMERICA, INC., as follows:

### DISCOVERY CONTROL PLAN

1.      Pursuant to Rule 190.1 of the Texas Rules of Civil Procedure, discovery is intended to be conducted under a Level 2 Discovery Control Plan.

### PARTIES

2.      Plaintiff Absolute Color, Ltd. (Absolute) is a Texas limited company with its principal place of business in Harris County, Texas.

3.      Defendant Xeikon America, Inc. (Xeikon) is a Delaware corporation transacting business in Harris County, Texas.  It can be served with process through its registered agent, National Registered Agents, Inc., 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

### JURISDICTION AND VENUE

4.      The subject matter in controversy is within the jurisdictional limits of this Court. Pursuant to Texas Rule of Civil Procedure 47(c), Absolute affirmatively states that it seeks monetary relief over $200,000 but not more than $1,000,000.

5.      Venue is proper in Harris County, Texas pursuant to Section 15.002(a)(1) of the Texas Civil Practice and Remedies Code because it is the county in which all or a substantial part of the events or omissions giving rise to the claim occurred.

Certified Document Number: 80101686 - Page 1 of 6

**FACTUAL BACKGROUND**

6.     Absolute is a Houston-based commercial printing company.  Absolute primarily provides high quality business wholesale printing.

7.     In late 2017, Absolute was in the market for a new commercial printing press. Xeikon representatives were anxious to place one of its machines at Absolute Color, presumably to leverage its ability to market to other printing companies like Absolute.

8.     Xeikon marketed its Xeikon 9800 Commercial Printing Press (the "Press") to Absolute.  Xeikon's marketing materials for the Press describe it as the top of the market.  Some of the representations relating to the Press are as follows:

- "ultimate performer in document production."

- "top performer in its playing field in terms of quality"

- Provides "top quality printing" that takes [Xeikon's] "trademark qualities to the next level without making any compromises."

- "…with the Xeion 9800 you'll play in a league of your own."

- "unmatched …quality…"

- "perfectly suited for high-end direct marketing work"

- "perfect color consistency"

*See, Exhibit 1 attached hereto and incorporated as if set out verbatim.*

9.     The Xeikon 9800 is a very expensive piece of equipment with an initial list price of over $848,000.  At the original list price, Absolute was not going to purchase the unit.  However, Xeikon represented to Absolute that it would provide a very significant "Café" discount to Absolute.  Based upon the representations about quality and based upon the purchase incentive, Absolute agreed to purchase the Press.

Certified Document Number: 80101686 - Page 2 of 6

2

APPENDIX 0007

10.     Absolute and Xeikon entered into a Sales Agreement relating to the purchase of the Press that is attached hereto as *Exhibit 2* and incorporated herein as if set out verbatim.

11.     Absolute has never formally accepted the Press.  To date, some parts have still not been finally installed on the Press.  Moreover, within a reasonable time after delivery, Absolute rejected the Press by informing Xeikon of problems with the Press.  Specifically, Absolute advised Xeikon of problems with scuffing of the printed surfaces --- a condition that is not acceptable to sophisticated business print consumers.  At least one customer rejected a print job printed on the Press because of the scuffing.  Acknowledging that this was a problem that had not previously been disclosed, Xeikon then wanted to sell Absolute a second piece of "finishing" equipment and require Absolute to buy more Xeikon products.   Throughout the entire sales cycle, Xeikon never disclosed the need for a second piece of equipment nor the problem with the print scuffing.  In addition to the scuffing problem, when Absolute attempts to cut any material printed on the Press, the Xeikon ink is melting on the cutter blade resulting in dirtying the job while being cut.  This problem also leads to delays in printing time and additional labor cost to Absolute.

12.     These problems are not as expected of a piece of equipment that was supposed to produce printing that was "perfect", "high quality", or "unmatched in quality."

13.     Xeikon has refused to take return of the rejected Press or refund the purchase money.

**FIRST CAUSE OF ACTION: DECEPTIVE TRADE PRACTICES ACT VIOLATIONS**

14.     Absolute hereby incorporates be reference the factual allegations set forth in the preceding paragraphs as if fully set forth herein.

15.     Absolute is a consumer under the Deceptive Trade Practices Act (DTPA) because it sought or acquired goods or services from Xeikon.  Xeikon's deceptive acts or practices detail

Certified Document Number: 80101686 - Page 3 of 6

APPENDIX 0008

above were committed in connection with Absolute's transaction in acquiring such goods of services.

16.     In connection with inducing Absolute to purchase the Press, Xeikon committed false, misleading, or deceptive acts by (i) representing that goods or services had characteristics, qualities, uses, or benefits, which they did not have; (ii) failing to disclose information concerning goods or services which was known at the time of the transaction and such failure was intended to induce Absolute into entering into an agreement that it would not have otherwise entered into had the information been disclosed.   Additionally, Xeikon has violated the DTPA by engaging in an unconscionable action or course of action by taking advantage of Absolute's lack of knowledge, ability, experience, or capacity to a grossly unfair degree.

17.     Pursuant to the DTPA, Absolute seeks economic damages and legal fees.   Xeikon's actions were a producing cause of Absolute's damages.   Moreover, because Xeikon knowingly and intentionally violated the DTPA, Absolute seeks additional damages of up to three times the amount of economic damages.

### SECOND CAUSE OF ACTION: FRAUD BY NONDISCLOSURE

18.     Absolute hereby incorporates be reference the factual allegations set forth in the preceding paragraphs as if fully set forth herein.

19.     Xeikon concealed from or failed to disclose certain facts to Absolute.   Xeikon had a duty to disclose those facts to Absolute.   Those facts were material and Xeikon, which had a duty to speak, knew that Absolute was ignorant of the facts and did not have an equal opportunity to discover the facts.   By failing to disclose certain facts, Xeikon intended to induce Absolute to make payments to Xeikon.   Absolute, which relied on Xeikon's nondisclosure, was injured and seeks recovery herein.

Certified Document Number: 80101686 - Page 4 of 6

APPENDIX 0009

### THIRD CAUSE OF ACTION: NEGLIGENT MISREPRESENTATION

20.     Absolute hereby incorporates be reference the factual allegations set forth in the preceding paragraphs as if fully set forth herein.

21.     Xeikon made representations to Absolute in the course of Xeikon's business or in a transaction in which Xeikon had an interest.  Xeikon supplied false information for the guidance of others and did not exercise reasonable care or competence in obtaining or communication the information.  Absolute justifiably relied on the representations and such negligent misrepresentations proximately caused injuries to Absolute, for which it seeks recovery herein.

### FOURTH CAUSE OF ACTION: FRAUDULENT INDUCEMENT

22.     Absolute hereby incorporates be reference the factual allegations set forth in the preceding paragraphs as if fully set forth herein.

23.     Xeikon made certain representations to Absolute. Those representations were material and false, and were made with the intent that Absolute act on them.  When Xeikon made such representations, Xeikon knew the representations were false, or made the representations recklessly, as positive assertions, and without knowledge of their truth.  Absolute, which relied on Xeikon's representations, was injured and seeks recovery herein.

### ATTORNEYS' FEES

24.     Absolute seeks to recover its reasonable and necessary attorneys' fees pursuant to Section 17.50(d) of the DTPA.

### CONDITIONS PRECEDENT

25.     All conditions precedent necessary to maintain this action have been performed, have been waived, or have occurred.

## REQUEST FOR DISCLOSURE

26.     Pursuant to Rule 194 of the Texas Rules of Civil Procedure, Xeikon is requested to disclose within fifty (50) days of service of this Request, the information or materials described in all of Rule 194.2.

## RELIEF REQUESTED

Plaintiff, ABSOLUTE COLOR, LTD., prays that Defendant, XEIKON AMERICA, INC., be cited to appear and answer herein, and that upon final trial, ABSOLUTE COLOR, LTD. be awarded judgment against Defendant for the following:

(a)     Actual damages;

(b)     Treble damages;

(c)     Reasonable and necessary attorneys' fees;

(d)     Interest on all of the above-referenced amounts at the highest rate allowed by law;

(e)     Costs of suit; and

(f)     Such other and further relief to which ABSOLUTE COLOR, LTD. may be entitled.

Respectfully submitted,

DOW GOLUB REMELS & GILBREATH, PLLC


By: /s/ *Keith M. Remels*
        Keith M. Remels
        Texas Bar No. 16765800
        2700 Post Oak Blvd., Suite 1750
        Houston, Texas 77056
        Telephone:  (713) 526-3700
        Facsimile: (713) 526-3750
        kremels@dowgolub.com

**ATTORNEYS FOR PLAINTIFF**



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   June 26, 2018

Certified Document Number:      80101686 Total Pages:  6

Chris Daniel, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

APPENDIX 0012

**XEIKON**

EN ≡

LABEL PRESSES    FOLDING CARTON PRESSES    COMMERCIAL PRESSES

SERVICES & SOLUTIONS    BLOG    CONTACT

# STEP ON IT WITH THE XEIKON 9800

## WHO SAID SPEED MEANT YOU'D HAVE TO COMPROMISE QUALITY?

⬇ **Get into detail**
Download our Xeikon 9800 spec sheet

✉ **Get in touch with us**
Discover what the Xeikon 9800 could do for you

Extending your capacity, you said? Say hi to our ultimate performer in document production, the Xeikon 9800. Fast, versatile in media handling, flexible workflow, top quality printing – he takes all the Xeikon trademark qualities to the next level without making any compromises.

Exhibit 1-A

This website uses cookies to ensure you get the best experience on our website. More info    ✕

APPENDIX 0013

# Imagine what it could do for your business.

    

wide substrate range   top web speed   high quality printing   variable data capabilities   variable printing width up to 512 mm

**wide substrate range**

(un)coated paper, paperboard, synthetic media…



**Get into detail**
Download our Xeikon 9800 spec sheet



**Get in touch with us**
Discover what the Xeikon 9800 could do for you

# Taking digital document production further. A lot

More demanding customers, just-in-time orders, shorter runs, more different print jobs… You're already used to tackling your ordinary challenges, but you still want to up your game? Whether to diversify your offering or deliver your documents even faster, with the Xeikon 9800 you'll play in a league of your own. Its unmatched combination of speed, quality and flexibility makes it your major driver for your business.

Certified Document Number: 80101687 - Page 2 of 6

This website uses cookies to ensure you get the best experience on our website. More info

# Create the ultimate Document Production Suite with a Xeikon 9800

**The Xeikon 9800 comes as part of a complete solution**. Toner, print media, converting equipment and the digital front-end build a Document Production Suite, together with the press itself. Better even, you'll be able to customize it your specific goals and workflows.

 **Get into detail**
Download our Xeikon 9800 spec sheet

 **Get in touch with us**
Discover what the Xeikon 9800 could do for you



## GET INTO DETAIL

Download our Xeikon 9800 spec sheet



## GET IN TOUCH WITH US

Discover what the Xeikon 9800 could do for you

Certified Document Number: 80101687 - Page 3 of 6

This website uses cookies to ensure you get the best experience on our website. More info

APPENDIX 0015

# How much is that Xeikon 9800 in the window?

Pricing really depends on your wishes and your set-up. **So we'll have to get to know each other a bit before we can set your Xeikon 9800 price.** So just leave us a message, okay? And we'll get back to you to talk things through.

**Get into detail**
Download our Xeikon 9800 spec sheet

**Get in touch with us**
Discover what the Xeikon 9800 could do for you

# Have a question about the Xeikon 9800?

| Name | Company | Email |

| Country | Phone number (op) | Subject |

| Question |

This website uses cookies to ensure you get the best experience on our website. More info

I'm not a robot

reCAPTCHA
Privacy - Terms

Send

# Presses

Label Presses
Folding Carton
Presses
Commercial

# Services & Solutions

Service
Care


**Get into detail**
Download our Xeikon 9800 spec sheet


**Get in touch with us**
Discover what the Xeikon 9800 could do for you

Self Adhesive
Labels Suite
Heat Transfer Label
Suite
Folding Carton
Suite
Wall Decoration
Suite
Leaflet Production
Suite
Document
Production Suite
Large Format
Production Suite

# Blog

Commercial
Folding carton
General
Labels

# Contact

This website uses cookies to ensure you get the best experience on our website.

Book Production Suite

  

*A division of* **Flint**Group

Quality survey 2018 | Events & Blog | Contact | Disclaimer | Terms & conditions | Glossary | E-commerce | Printmedia

Copyright 2018 Xeikon. All rights reserved



**Get into detail**
Download our Xeikon 9800 spec sheet



**Get in touch with us**
Discover what the Xeikon 9800 could do for you

This website uses cookies to ensure you get the best experience on our website. More info

APPENDIX 0018



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   June 26, 2018

Certified Document Number:        80101687 Total Pages:  6

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**



# XEIKON 9800
The benchmark for quality & versatility in digital document printing

Meet the top performer in its playing field in terms of quality and versatility. This press extends the limits of a printer's production capacity.

The Xeikon 9800 combines the capability to use a wide substrate range and a unique format flexibility with top-productivity; this offers an unsurpassed range of applications. The variable data capabilities of the X-800 front-end make this press perfectly suited for high-end direct marketing work.

Xeikon uses customer driven innovation to constantly improve its patented dry-toner imaging process allowing its customers to grow their business; the Xeikon 9800 uses uniquely adapted toner, QA-CD.

Certified Document Number: 840816863 - Page 16 of

Exhibit 1-B          APPENDIX 0020

# XEIKON 9800
## specifications

## THE UNIQUENESS OF THE XEIKON 9800 SOLUTION IS IN ITS COMBINATION OF PRODUCTIVITY & QUALITY BENEFITS.

- High productivity in One-Pass-Duplex web fed printing
- Professional image and data integrity
- Print resolution: true 1200 dpi with variable dot density
- Refined screening library
- Perfect color consistency and professional color management
- 5th color stations for spot color reproduction and security applications
- QA-CD dry toner
  - Allowing the use of substrate without specific pre-treatment
  - No VOC emission
  - Wide color gamut
- Variable printing width and length
- Flexible integration with graphic arts (PDF) and IPDS workflows
- High uptime
- Expert consultancy and service



**XEIKON INTERNATIONAL BV**
T. +31 (0)117 37 50 20 - F. +31 (0)117 37 50 21
Brieversstraat 70 - 4529 GZ Eede - the Netherlands
www.xeikon.com - info@xeikon.com

9800_ENG_081618_spec

© 2016 Xeikon International BV. All rights reserved. All trademarks are property of their respective owners. No parts of this brochure may be reproduced, copied, adapted, translated or transmitted in any form or by any means, without prior written permission from Xeikon. The material in this brochure is for informational purposes only and is subject to change without prior notice. No responsibility is assumed by Xeikon for any errors, which may appear in this brochure.

Certified Document Number: 80101688 - Page 2 of 2

| PRINT TECHNOLOGY & FEATURES | |
|---|---|
| Process | LED-array-based, dry toner electrophotograph |
| Color configuration | 5/5 One-Pass-Duplex™, 5th station for spot col |
| In-line density control | Standard |
| In-line register control | Standard |
| Cutter | Standard, max. cutspeed 260 ppm |
| **TONER SYSTEM** | |
| Toner | Xeikon QA-CD dry toner |
| Special colors | Spot colors: R-G-B, ExtraMagenta, White, Cle |
| | Orange, SuperBlack, MatteSilver, PalladiumSilv |
| Light fastness | 6-8 on blue wool scale |
| **PRINT MEDIA** | |
| Pre-printed stock functionality | Standard |
| Web-fed | Paper, paperboard & synthetic media |
| | All media listed on www.xeikon.com |
| Media width | 320 - 512 mm (12,6" - 20,2") |
| Media weight | 40 - 350 gsm (27 lb text to 130 lb cover) |
| Media caliper | < 550 µm (< 21,65 mil) |
| Web alignment | Active web alignment standard |
| **PRESS THROUGHPUT** | |
| Web speed | Up to 21,5 m/min (70 ft/min) |
| Printing speed* | 290 ppm (17,400 pages/hour) up to 60 gsm |
| | 260 ppm (15,600 pages/hour) up to 90 gsm |
| | 230 ppm (13,800 pages/hour) up to 100 gsm |
| | 195 ppm (11,700 pages/hour) up to 150 gsm |
| | 160 ppm (9,600 pages/hour) up to 200 gsm |
| | 130 ppm (7,800 pages/hour) up to 250 gsm |
| | 100 ppm (6,000 pages/hour) up to 300 gsm |
| | 70 ppm (4,200 pages/hour) up to 350 gsm |
| Duty cycle* | Up to 10,000,000 pages/month |
| **IMAGING** | |
| Resolution | 1200 dpi with variable dot density |
| Screening | Pericles screening library up to 240 lpi |
| Imaging width | 504 mm (19,8") |
| Digital front-end | Xeikon X-800 |
| Operator GUI | X-800 MyPress Controller |
| Compliance | CE, CB, FCC, deinkabililty (Ingede) |
| **PERIPHERAL EQUIPMENT, UPGRADES AND SERVICES (Optional)** | |
| Unwinder | Reels up to 1,500 mm (59,0") diameter |
| Jumbo rewinder | Reels up to 1,000 mm (39,4") diameter |
| Stacker | Xeikon stacker or Pile High Stacker |
| Web Varnishing Module (WVM) | Single side varnish module UV and/or waterba |
| Web Finishing Module (WFM) | For print protection in finishing devices |
| IPDS controller | IPDS encapsulated PDF optional. IPDS RIP su |
| Xeikon Color Services | Service packs help you create the proper color |

* A4 full color pages, when printing double-sided



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   June 26, 2018

Certified Document Number:        80101688 Total Pages:  2

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

APPENDIX 0022

Certified Document Number: 80101689 - Page 1 of 16



# Sales Agreement

# For (1)

# Xeikon 9800 Digital Color Press

## With Variable Width Stacker, Rewinder, and G7 Color Control Package



## November 15, 2017

This Sales Agreement expires November 30, 2017

Exhibit 2

Absolute Color 9800

Page 1 of 11

Xeikon America, Inc.; P: 630-438-7900; F: 630-438-7915; info.americas@xeikon.com

11/15/2017

v2.0

APPENDIX 0023

SALES AGREEMENT.................................................................................................... 3

Addendum 1: Modifications, Acceptance Criteria and Sales Tax.................................. 4

Addendum 2: MSDS sheet for toner ............................................................................. 5

Addendum 3: Site Survey Basics................................................................................... 6

Addendum 4: Terms and Conditions ............................................................................. 7

Certified Document Number: 80101689 - Page 2 of 16

Xeikon America, Inc.
1375 East Irving Park Rd
Itasca, IL 60143

**Prepared by:**     **Mark Pomerantz, Regional Sales Manager**
**Date:**            **November 15, 2017**

Tel: 678 749 6653

Absolute Color 9800                                                                11/15/2017

APPENDIX 0024

**Addendum 1: Modifications, Acceptance Criteria and Sales Tax**

## Modifications

- 9 month warranty + 6 month Gold Entry Level Service Contract (separate document for service contract)
- Xeikon will provide one (1) de-install and re-install of the press within one (1) year of date of installation at no additional charge, as long as Absolute Color is under warranty and/or Gold Service contract at that time. Also, sales and service contract must be signed by November 30, 2017 to confirm this exception.
- Absolute Color will be responsible to save all original packing crates so they can be used for the move. Absolute Color will also be responsible for providing transportation and any associated costs to deliver the press to the new facility within the Houston Metropolitan area.

## Acceptance Criteria

Described below are the principle business applications that were tested and will be used as the acceptance criteria for the installation of the Xeikon 9800 Digital Color Printing Solution. Xeikon will cooperate with Absolute Color to develop other, additional applications after these principle applications are demonstrated and deemed acceptable.

**Jobs**

General commercial printing

**Substrates**

Xeikon approved substrates

**Finishing**

Stacker and Rewinder (used)

## Sales Tax

The Purchaser listed in this Sales Agreement will provide Xeikon America Inc. with their Sales Tax Certificates.

Certified Document Number: 80101689 - Page 3 of 16

Absolute Color 9800

Page 4 of 11

Xeikon America, Inc.; P: 630-438-7900; F: 630-438-7915; info.americas@xeikon.com

11/15/2017

v2.0

APPENDIX 0025

## Addendum 2: MSDS sheet for toner

The following information is extracted from the MSDS sheets for toner. Full MSDS sheets are available on request.

### Hazards Identification
- Adverse Human Health Effects: Not applicable in normal use.
- Carcinogenicity: This product does not contain the carcinogenic substances, which are listed in NTP, IARC and are regulated by OSHA.
- Environmental Effects: Not applicable in normal use.
- Physical and Chemical Hazards: Not applicable in normal use.

### Accidental Release Measures
- Personal precautions: Minimize inhalation of dust.
- Environmental precautions: Keep product out of sewers and water hoses.
- Cleaning methods: If spilled, sweep up or pick up by vacuum cleaner (rated for toner extraction). Remove residue with soap and water.

### Handling and Storage
Handling (technical measures, precautions, safe handling material):
- Do not handle in areas where wind blows.
- Flying powder may enter eyes.
- Minimize breathing dust.

Storage (technical measures, storage conditions, packaging material):
- Avoid direct sunlight.
- Do not keep this over 35°C
- Keep out of reach of children.

### Exposure Controls / Personal Protection
- Respiratory Protections: None required under normal conditions of use.
- Hand Protection: None required under normal conditions of use.
- Eye Protection: None required under normal conditions of use.
- Skin and Body Protection: None required under normal conditions of use.

### Stability and Reactivity
- Conditions to avoid: Not applicable in normal use.
- Materials to avoid: Not applicable in normal use.
- Hazardous Decomposition Products: Will not occur

### Ecological Information
- Persistence/Degradability: not known
- Bioaccumulation: Not known in bioaccumulation.
- Acute toxicity for fish: not available
- Acute toxicity for daphnia: not applicable
- Algae inhibition test: not applicable

### Disposal Consideration
- Recommended methods for safe environmentally preferred disposal: Used toner should be disposed of in an environmentally appropriate manner and in accordance with governmental regulations. Do not incinerate.

Certified Document Number: 80101689 - Page 4 of 16

## SALES AGREEMENT

This Sales Agreement ("Agreement") is made and entered into _____ between Xeikon America, Inc., ("Seller") and the purchaser listed below for the sale of the Equipment described herein subject to the Terms and Conditions set forth in attached sheets.

| Bill To ("Purchaser")<br>Absolute Color | | Ship To (Show Only If Different From "Bill To") | |
|---|---|---|---|
| **Attention**<br>Hugh Nguyen | **Phone Number and Email**<br>(713) 996-0202  hugh@absolutecolor.com | **Attention** | **Phone Number and Email** |
| **Street and Number**<br>5810 Windfern Road | **Customer P.O # & Date** | **Street and Number** | |
| **City, State, Zip Code**<br>Houston, TX 77041 | | **City, County, State, And Zip Code** | |

| Qty. | Description of Equipment | List Price |
|---|---|---|
| 1 | XEIKON 9800 Digital 5-Color Press | |
| 1 | XEIKON X-800 Digital Front End with optional G7 XCC Premium Color Control Package including Alwan APS (G7), Color Key, Color Forecast Pro, X-Rite IO Table, X-Rite i1O Spectrophotometer, 4 days training | |
| 1 | PMS Large-i (Xeikon integrated Jumbo Unwinder)<br>Airshaft not included - Max 350 gsm | |
| 1 | Airshaft 3" / 76 mm (Xeikon integrated Jumbo Unwinder) | |
| 1 | Paper stacker - Variable Width | |
| 1 | PXN500 Rewinder (used) | $848,695 |
| 1 | Xeikon 9600 starter kit | |
| 1 | Shipping from Itasca, IL to Houston, TX | |
| 1 | Press Installation | |
| 1 | Basic operator training (BOT) - 1 week in Itasca, IL | |
| 1 | Basic workflow training (BWT) - 1 week in Itasca, IL | |
| 1 | On-Call Print Consultancy - Up to 2 weeks at the customer site | |
| 1 | Basic Service Engineer (BSE) training | |
| 1 | 9 month warranty / Gold Service | |

| No Trade-In | | | | |
|---|---|---|---|---|

| Total List Price | $848,695 |
|---|---|
| Less: Xeikon Café Discount | ($373,150) |
| Net Sales Price/Purchase Price | $475,545 |
| Applicable Sales Tax | TBD |
| 20% Initial Deposit to confirm order | $95,109 |
| 60% Prior to shipment of equipment from Xeikon facility | $285,327 |
| 20% Upon delivery, installation and customer acceptance | $95,109 |
| Transportation: FCA Itasca, IL | Included in price |

**Seller**  Sales Representative (Signature)

Approved Signature – Xeikon America, Inc.

**Buyer**  By (Signature)

Type or print name and title above

Absolute Color 9800

11/15/2017

APPENDIX 0027

Certified Document Number: 80101689 - Page 5 of 16

## Addendum 3: Site Survey Basics

A Xeikon installation technician will go over the full site survey document with you in-person before the installation of the press. This section is a compressed version of our full site survey document to help familiarize you with some of the basic requirements. Some information may differ depending on your press type and peripheral equipment.

**Environment**
- Is the press room temperature and humidity controlled?
  (Temperature: 68-77 Degree F; Humidity: 28-53 %)
- Is the press room clean (no paper dust generated by other equipment)?
- The press exhaust is normally ducted out of the press room by the customer.

**Flooring**
- The press must be installed on level ground.
- The press should not be installed on wood floors, carpet or tile.
- Concrete is preferred.
- The press can be installed on linoleum tile covered floors.

**Jumbo Unwinder**
- Have the appropriate air shaft cores been ordered?
- Is a compressed air supply available?

**Electrical**
- The electrical should be ready for final connection to the press and other peripheral equipment by Wednesday morning of the set installation week.
- Specific electrical information will be given during the full site survey.

**Floor Plan and Access**
- Is there appropriate loading dock access?
- Is there on site storage for the crated press?
- Will the press be installed on the same level as the loading dock? If not, extra equipment and personnel may be needed to complete the install.
- Do all doors from dock to the final location of the press meet minimum dimensions (70 inches wide by 82 inches in height)?
- Customer may need to rent a 5000 lbs capacity forklift if one is not available.
- Minimum press room size is 20 feet wide by 8 feet 6 inches in height by 32 feet long (for a press with no extra peripheral equipment besides a stacker and a jumbo unwinder).

**Chiller Location**
- Are the chillers going to be located more than 33 feet from the press? If so, a large booster pump needs to be included with the press.
- The chillers are not to be installed any higher than 10 feet from the same level that the press is on unless a large booster pump is used.
- Does the customer want to put the chillers outside? We can provide a special set of outdoor chillers.

**Starter kits**
- Starter kits should be ordered with all presses. They are necessary for the installation process and training.

Certified Document Number: 80101689 - Page 6 of 16

## Addendum 4: Terms and Conditions

1.  Binding Effect.  The binding effect of this Sales Agreement ("Agreement") is subject to execution by the President of Xeikon America, Inc. (Seller) at its principal place of business in Itasca, Illinois (notice of execution being hereby waived by Purchaser). Receipt of any Payment or the filing of a financing statement by Seller shall not constitute execution.

2.  Equipment.  Seller agrees to sell and Purchaser agrees to purchase the Equipment from Seller, at the purchase price set forth on the face hereof and subject to the terms and conditions of this Agreement.

3.  Payment.  The Purchase Price is payable as specified in the Sales Agreement upon execution of this Agreement without further demand.  Equipment is sold FCA Itasca, IL (for the USA) and FCA Montreal, QC (for Canada).  Purchaser shall be responsible for and shall pay installation, diversion and restocking charges and all taxes, fees and assessments, now or hereafter imposed, which are applicable to the transactions covered in this Agreement.  Purchaser shall pay interest, at the highest rate permitted by law but not to exceed 1 ½% per month, from the date due, on any payment which is delinquent 30 days or more.

4.  Shipment.  Seller expects that shipment shall occur on approximately the date shown on the face of the Agreement.  For purposes of this Agreement, shipment shall mean the Equipment has been delivered to Seller's shipping dock(s).  When the Equipment is ready to be shipped, Seller shall so advise the Purchaser.  If Purchaser delays shipment, the Final Payment shall be made as required by Section 3 as though shipment had occurred.  Seller may store the Equipment at Purchaser's risk and expense.

Seller's obligations hereunder are subject to delays incident to labor difficulties, fires, casualties and accidents; acts of the elements; acts of the public enemy; transportation difficulties; governmental interference or regulations; inability to obtain equipment, materials or qualified labor sufficient to fill its orders in a timely manner; and other causes beyond its control.  Although Seller shall use its best efforts to ship Equipment in the Order of receipt of Initial Deposits, Purchaser has no right to have components or work-in-progress identified with this Agreement and Seller has the right to deliver Equipment units to customers in any order it deems reasonable.  If shipment of Equipment is delayed beyond six (6) months from the expected shipment date, Purchaser may terminate this Agreement by written notice to Seller, and Seller shall immediately refund all payments previously made under the Agreement without interest.  Equipment is sold FCA Itasca, IL (for the USA) and FCA Montréal, QC (for Canada).

The packaging of the main Equipment remains Xeikon property, and if requested, should be returned to Xeikon forthwith after the installation of the Equipment, according to the labels attached to the concerned packaging and to the return procedures.

5.  Installation.  Purchaser shall promptly unload and position the Equipment in the original unopened crates or cartons within its plant, and is responsible, without limitation, for providing an adequate foundation, necessary equipment, materials, services, technically qualified personnel and utilities to the Equipment.  The Equipment installation site must conform to the Seller's published space, utilities, and environmental requirements and the Purchaser agrees to provide, at no charge, access to the Equipment and to a telephone.  Seller will be responsible for start-up of the Equipment.  The Equipment shall be deemed accepted by the Purchaser upon completion of installation or by production use by the Purchaser or whichever is earlier as determined by Seller.

6.  Other Services.  This agreement does not cover maintenance service; Purchaser may elect to purchase maintenance service with respect to any Equipment purchased under this Agreement by entering into a separate maintenance agreement with Seller. Instruction and/or training in the operation of the Equipment shall be at the Purchaser's option and expense.

Absolute Color 9800

11/15/2017

Page 7 of 11
Xeikon America, Inc.; P: 630-438-7900; F: 630-438-7915; info.americas@xeikon.com

v2.0

APPENDIX 0029

Certified Document Number: 80101689 - Page 7 of 16

7.   Warranties. Seller warrants that upon receipt of the Final Payment, in case from the Purchaser, title to the Equipment shall pass to Purchaser free and clear. Seller warrants to the original Purchaser only that under normal use, as defined below, the Equipment purchased shall be free from defects in material and workmanship for the applicable warranty periods as measured from the original date of installation. The applicable warranty periods are as follows: 90 days on parts and labor for New (N) and Refurbished (RF) machines; 30 days on parts and labor for reconditioned machines (RC) and "As Is" for Used (U) machines unless otherwise recorded on the face of this Agreement. Seller's obligations under this warranty, and during the stated warranty period, are (a) limited solely to the repair or, at Seller's option, replacement of equipment or parts which Seller determines to be defective upon the return thereof F.O.B. Seller's plant within the warranty period, and (b) do not include consumable supplies, usage parts, labor, periodic adjustments, software except for defective diskettes, or maintenance necessitated by normal equipment usage. Seller shall have no obligation under this warranty in the event that: (a) the Equipment has been subject to abuse, improper installation or application, alteration, accident or negligence in use, storage, transportation or handling, and such actions or occurrences are not the fault of seller; (b) the Equipment is used in combination or connection with other equipment, attachments or supplies not approved in writing by Seller for use in combination or connection with the equipment; (c) installation, repair, replacement of parts, adjustment, service (other than normal operation maintenance), or other work on the Equipment is performed by Purchaser, Purchaser's customers or any third party, unless the same shall have been expressly authorized in writing by Seller; (d) Purchaser has not provided electrical service conforming to applicable electrical codes, including a dedicated line for power supply and appropriate polarization and grounding in accordance with Seller's specifications, or (e) Purchaser fails to timely perform operating maintenance as specified in Seller's Operator's Manual. Repairs or replacements qualifying under this warranty shall be performed on regularly business days and during Seller's regular business hours within a reasonable time following Purchaser's request. All requests for warranty fulfilment must be made during the stated warranty period. Normal Use for any Equipment is deemed to be up to a three-shift operation not exceeding 120 business hours per week. THE WARRANTIES CONTAINED IN THIS AGREEMENT ARE IN LIEU OF ALL OTHER WARRANTIES OF ANY KIND WHATSOVER, EXPRESS, IMPLIED, OR STATUTORY; AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE WHICH EXCEED THE AFORESAID OBLIGATIONS ARE HEREBY DISCLAIMED BY SELLER AND EXCLUDED FROM THIS AGREEMENT.

8.   Limitation of Liability. Seller's liability for damages to Purchaser relating to or arising out of the performance or non-performance of the Equipment, or for any cause whatsoever, and regardless of the form of action, whether in contract or in tort including negligence, shall be limited to the total sale price stated herein for the specific equipment that caused the damage or is the subject matter of or is directly related to the cause of action. The foregoing limitation of liability will not apply to claims for personal injury caused solely by Purchaser's negligence. IN NO EVENT SHALL SELLER BE LIABLE TO PURCHASER OR ANY ONE CLAIMING THROUGH OR AGAINST PURCHASER FOR ANY SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES (INCLUDING LOST PROFITS, REVENUES, BUSINESS OPPORTUNITIES OR INTERRUPTION OF BUSINESS) RESULTING FROM OR ARISING OUT OF THE DELIVERY, INSTALLATION, OPERATION, PERFORMANCE OR USE OF THE EQUIPMENT (OR NON-PERFORMANCE, DELAY IN OR FAILURE OF THE SAME), EVEN IF SELLER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

9.   Confidentiality. Any information, document, description, sample or prototype released by either party to this Agreement which is deemed confidential by the originating party, shall be marked or described in writing as a "Confidential". All "Confidential" information shall be held confidential for a period of one (1) year from date of shipment and may not be released to a third party without the originating party's written consent. The software programs ("Programs") used to control and operate the Equipment are owned by or licensed by Seller and this Agreement does not transfer to Purchaser title to or any proprietary rights in any such Programs. Purchaser shall maintain the Programs in strictest confidence and maintain reasonable procedures regulating access to such Programs. Purchaser shall utilize the Programs only with Equipment supplied by Seller. Purchaser shall not attempt to reverse engineer, duplicate or otherwise copy any of the Programs in whole or in part, except the Purchaser shall be entitled to make a back-up copy. Any such copy shall bear the copyright notice and legend embodied in the Program furnished to Purchaser. The Programs shall only be disclosed to employees of the Purchaser requiring access to enable the Purchaser to properly use the Programs to manage, control or operate the Equipment.

Certified Document Number: 80101689 - Page 8 of 16

Absolute Color 9800                                                                                                11/15/2017
Xeikon America, Inc.; P: 630-438-7900; F: 630-438-7915; info.americas@xeikon.com                v2.0
APPENDIX 0030

Purchaser acknowledges that equitable remedies, including without limitation, injunction against breaches of the covenants set forth in this Section 9, are necessary to protect the interest of the Seller and Seller's licensors in their respective confidential information and software programs and shall be available to the Seller and Seller's licensors. The covenants set forth in this Section 9 shall survive the termination of this Agreement. Neither the license granted herein or the Programs may be sold, assigned or otherwise transferred by Purchaser to any third party without the written authorization of Seller, except that each Program may be transferred with the Equipment provided the transferee agrees in writing to assume all the obligations of Purchaser hereunder and Seller is notified of such transfer and agreement prior to such transfer.

10. Infringement of Intellectual Property Rights.  Seller (or its supplier) shall indemnify and hold Purchaser harmless against an award of damages and costs against Purchaser by a final judgment of a court of last resort in the country in which the Equipment is originally installed by Seller resulting from actual or alleged patent infringement relating in any way to use or sale of the Equipment, or any component thereof furnished hereunder, provided that Purchaser (i) gives Seller immediate notice in writing of any suit or claim for infringement against Purchaser, (ii) permits Seller (or its supplier) to control the defense of any suit or claim, and (iii) gives Seller (or its supplier) all available information, assistance, and authority to enable Seller (or its supplier) to assume such defense.  Seller (or its supplier) shall diligently defend and prosecute all such patent infringement litigation and shall keep Purchaser fully informed of all developments in the defense or adjustments of any such claim or action.

If a final injunction or judgment in any patent infringement action is rendered restraining Purchaser's use of the Equipment, or of any component thereof, Seller shall, at its option and expense, either (i) procure for Purchaser the right to use the Equipment, or (ii) replace or modify the infringing component so that it no longer infringes, or (iii) repurchase the Equipment upon its return to Seller, less reasonable depreciation of 2% per month from date of installation, for use, damage, or obsolescence.

Seller shall have no liability whatsoever to Purchaser if any such patent infringement or claim thereof is based upon or arises from (i) the use of any Equipment in combination with an apparatus or device not manufactured or supplied by Seller and such combination cause the infringement, (ii) the use of any Equipment in a manner for which it was neither designed nor contemplated, or (iii) any modification of any Equipment by Purchaser, or by Seller at Purchaser's request, or by any third party, which causes the Equipment to become infringing.

11. Indemnification.  Purchaser shall indemnify and hold Seller harmless from and against any and all losses, expenses and damages arising out of or incident to willful or negligent acts or omissions of Purchaser.

12. Security Interest.  To secure payment under this Agreement, Seller reserves, and Purchaser hereby grants to Seller, a security interest in (a) the Equipment covered by this Agreement, (b) any substitutions, replacements and additions thereto and (c) the proceeds thereof, until final payment on this agreement has been satisfied.  This Agreement shall be deemed a security agreement and a copy thereof may be filed as a financing statement with appropriate public agencies in order to protect Seller's security interest. Purchaser hereby authorizes Seller, or its assignee, where permitted by applicable state law, to sign on Purchaser's behalf and file financing statements in order to protect the security interest of Seller hereunder.

13. Risk of Loss and Insurance.  Risk of loss shall pass to the Purchaser upon shipment from the warehouse (Itasca, IL in the USA/Montreal, QC in Canada) notwithstanding the fact that Seller may have selected the carrier.  Until the Purchase price has been paid in full, in cash, Purchaser shall insure the Equipment against fire and extended coverage perils in an amount equal to the full Purchase Price, with loss first payable to Seller as its interest may appear.  Purchaser's obligations hereunder may be covered by Purchaser's "blanket coverage" insurance policies.  If Purchaser fails to maintain such insurance, Seller may obtain the same at Purchaser's expense.

14. Maintenance of ownership.  The equipment contemplated by this Installment Sales Contract and by the Sales Agreement is put in Purchaser's possession hereunder and Seller shall remain the owner thereof until payment in full and compliance with each and every one of the terms and conditions hereof.`

15. Events of default.  The parties agree that should the Purchaser fail to comply with any of its obligations, the Seller shall be entitled to enforce an event of default and to demand full payment of any amounts owing.

Absolute Color 9800                                                                                            11/15/2017

Certified Document Number: 80101689 - Page 9 of 16

16. Seller's Remedies. In the event Purchaser (a) Fails to pay any amount due and owing hereunder, (b) Fails to perform any other obligation hereunder, or (c) Ceases doing business, makes a bulk transfer of furniture, fixtures, other equipment or inventory, makes an assignment for the benefit of creditors; or breaches any other agreement between the parties; Seller shall have the right to exercise one or more of the following remedies: (a) recover the balance of all amounts due hereunder; (b) enter any premises where the Equipment may be located and take possession of the Equipment or render it unusable and retain all prior payments as partial compensation for its use and depreciation; (c) require Purchaser to assemble the Equipment for safe shipment and make it available to Seller; (d) sell the Equipment after at least 15 days notice before the time of any intended sale, and the proceeds thereof less reasonable expenses of retaking, repairing, holding and selling will be credited against any amount unpaid and Purchaser will pay the balance forthwith, any surplus, however, to be paid to Purchaser; (e) incur collection and legal expenses (including reasonable attorneys' fees) in exercising any of its rights and remedies upon default, which Purchaser shall pay and which shall become part of Seller's reasonable expenses of retaking, repairing, holding and reselling,  and (f) pursue any other remedy permitted by law more than 90 days prior to the anticipated shipment date, 5% if canceled between 31 and 90 days prior to the anticipated shipment date, or 15% if canceled 30 days or less prior to the anticipated shipment date if Purchaser cancels this Agreement and notice of such cancellation is received and approved by Seller prior to the shipment of any Equipment covered by this Agreement:  Should legal proceedings be instituted by Seller to recover any amounts due hereunder or to take procession of the Equipment, Purchaser shall pay all collection expenses (including reasonable attorneys' fees) and hereby waives trial by jury. If more than one Purchaser is named in this Agreement, the liability of each shall be joint and several.

Seller's rights shall be cumulative and action on one shall not be deemed to constitute an election or waiver of the other rights to which Seller may be entitled.  Waiver by Seller of a breach or default shall not constitute waiver of any other breach or default by Purchaser or waiver of any of Seller's rights.

17. Export and Re-Export.  Purchaser shall strictly comply with all applicable laws and regulations of the United States which govern the export and re-export of United States origin commodities and technical data. Specifically, and without limiting the generality of the foregoing, Purchaser shall not re-export any or all of the Equipment, or any component, outside the country where originally installed without the prior written authorization of the United States Government.

18. Miscellaneous Provisions.   If any term, condition, or remedy contained in this Agreement should be held invalid or unenforceable, the remaining terms, conditions, and remedies shall remain in full force and effect.

This agreement is not assignable; provided, however, that any or all of Seller's rights or obligations hereunder may be assigned by Seller without notice to Purchaser and may be exercised by an assignee thereof.  Purchase shall not assert against any transfer of this contract or against any transferee of promissory notes, any defense (other than actual payment), and set-off, equity or counterclaim which Purchaser may have or claim against Seller.

The acceptance of any payments after the specified due dates thereof shall not constitute a waiver of Purchaser's obligation to make future payments of the specified dates.  Seller may apply any amounts paid by Purchaser pursuant to this Agreement to any indebtedness owing by Purchaser to Seller on account hereof or otherwise.

This Agreement contains the entire understanding of the parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements made prior to the date hereof.  Any modifications, change or amendment of this Agreement shall be in writing and shall be signed by an authorized representative of each party.  Except for identifying goods, services, software, or Equipment ordered, prices and quantities, the terms and conditions contained in and referenced in Purchaser's purchase order or other ordering documents shall be of no force or effect.

This Agreement shall be deemed to have been made, and shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to its law of conflicts.  The parties hereby agree to expressly exclude from application the United Nations Convention or Contracts for the International Sale of Goods.

Certified Document Number: 80101689 - Page 10 of 16

Any notice given under the provisions of this Agreement shall be in writing and shall be delivered personally, sent by Certified or Registered Mail (Return Receipt Requested) or confirmed fax copy to Seller at its address on the face hereof to the attention of President, Xeikon America, Inc., and to Purchaser at its address on the face of this Agreement.

Notices delivered personally or by confirmed fax shall be effective upon receipt.  Notices delivered by mail shall be deemed effective five calendar days after the dispatch.

_____
Signature (Seller) Xeikon America, Inc.

_____
Signature (Buyer)

_____
Type or Print Name and Title

Hugh Nguyen
_____
Type or Print Name and Title

_____
Date

11/22/17
_____
Date

Certified Document Number: 80101689 - Page 11 of 16



## XEIKON CARE AGREEMENT

This Xeikon Entry Level Gold Care Agreement is entered into following machine warranty period for a period of six months between Xeikon America, Inc., and the Customer named below.

Xeikon America, Inc. agrees to perform service for Customer's equipment ("Equipment") listed below in consideration for the applicable charges and **subject to the Terms and Conditions set forth below and on the attached pages hereof.**

| **Customer Name** | Absolute Color |
| **Installation Address** | 5810 Windfern Rd |
| | Houston, TX  77041 |
| **Billing Address** | 5810 Windfern Rd |
| | Houston, TX  77041 |

| Model No. | Serial No. | Plan Type | Monthly Usage Allowance *(Printed Feet) | Overages *($/Ft.) | Billing Freq. | Base Monthly Charge |
|---|---|---|---|---|---|---|
| 9800 | TBC | Entry Gold | 50,000 | $0.015 | Monthly | $3,000.00 |
| | | | | | | |
| | | | | | | |
| | | | | | **Total Base Monthly Charge** | $3,000.00 |

*The **Base Monthly Charge** specified above includes a monthly usage allowance as specified in the above table under "Monthly Usage Allowance (Printed Feet)". A "Printed Foot" is defined as a linear length of web, imaged on one or two sides. In addition to the monthly base charge, printed feet in excess of the monthly usage allowance shall apply at the rate indicated above under "Overages ($/Ft.)".

| | **Xeikon America, Inc.** | **Absolute Color** |
|---|---|---|
| **Signed By** | | _(signature)_ |
| **Printed Name** | Patrick McCarthy | Hugh Nguyen |
| **Title** | VP of Operations | Partner |
| **Address** | 1375 East Irving Park Rd. | 5810 Windfern Rd |
| | Itasca, IL 60143 | Houston, TX  77041 |
| **Date** | | |

APPENDIX 0034

Certified Document Number: 80101689 - Page 12 of 16



## 1. ACCEPTANCE OF AGREEMENT

This agreement is subject to acceptance by Xeikon America, Inc. at its principal place of business at 1375 East Irving Park Rd, Itasca, IL 60143 (notice of acceptance being hereby waived by Customer).

## 2. TERM

This Agreement shall have an Initial Term of six (6) months commencing with the Effective Date hereof.  Unless terminated in accordance with Section 11, this Agreement shall automatically renew every 6 months.

## 3. SUPPORT ACTIVITIES

**The support activities included in this Entry Level Xeikon Gold Care Agreement are outlined in the table below.** *Please review the correct column depending upon your maintenance agreement.*

| | GOLD |
|---|---|
| **Telephone support** | |
| Telephone support (24/7) | Included |
| Live Video Conference Support (7.30 AM - 7.30 PM CST) | - |
| Prioritized response on service call | Included |
| **Material** | |
| Spare parts for service (not upgrades) | Included |
| Engine Firmware updates | Included |
| DFE minor Software updates | Included |
| **On site intervention** | |
| Labor cost | Included |
| Travel cost | Included |
| 4 hour target response time (normal business hours) | Included |
| **Training and Consultancy** | |
| Discount on Training and Consultancy courses | 10% |
| Access to available media scripts | Included |
| **Preventative maintenance visits** | 1 time/year |

**Your Maintenance Agreement Does Not Include:**
   a.  Repair, replacement, or furnishing of paper, toner, photoconductor drums, developer, software, software upgrades, cutter blades, brushes, wipers, scrapers, other usage parts and cleaning supplies.
   b.  Labor, parts and expenses necessary for (i) repair of damage caused by Customer's negligence, relocation of the Equipment, use of Equipment for  purposes other than those for which it was designed, failure to provide a suitable environment, accident, fire, water, power line voltages (or fluctuations) other than those specified for the particular Equipment or (ii) major repairs, overhauling or alteration of the Equipment (when any such major repair is requested, Xeikon America, Inc. will submit  an estimate of its charges for Customer's approval before the work is started);
   c.  Labor, parts and expenses necessary to correct Equipment problems that develop from the use of attachments or supplies which do not meet Xeikon America, Inc. specifications;
   d.  Optional retrofits; services connected with the relocation of Equipment; adding or removing accessories, attachments or other devices; or increases in service time resulting from operator neglect or unique applications.
   e.  Operational maintenance tasks (as specified in the operator's manual) necessary to keep the Equipment in good operating condition between maintenance calls.

Services excluded above will be performed in accordance with Xeikon America, Inc.' then-current hourly service rates.  Standard charges for travel and labor will be incurred by the Customer for service calls made for the purpose of installing operating supplies or for performing operator or key operator functions as specified in the operator's manual.

APPENDIX 0035

Certified Document Number: 80101689 - Page 13 of 16



## 4. CUSTOMER OBLIGATIONS

a. Customer agrees to perform operational maintenance tasks (as specified in the operator's manual) necessary to keep the Equipment in good operating condition between maintenance calls;

b. Customer agrees to provide a suitable environment for the Equipment as specified by Xeikon America, Inc. including proper lighting conditions;

c. Adequate space free of excessive dirt, dust, moisture, vibration, fumes or extremes of temperature; proper electrical power; a dedicated telephone line; and full, free and safe access to the Equipment to perform maintenance service.

d. Customer agrees to pay the Monthly Charges, standard charges for travel and labor incurred for service calls made for the purpose of installing operating supplies or for performing operator or key operator functions as specified in the operator's manual, and charges for parts or services not included in this Agreement. Customer's obligations to pay Monthly Charges for the entire Initial Term and each entire renewal term shall accrue on the Effective Date and the Annual Renewal Date, unless this Agreement is terminated as herein provided.

e. Customer agrees not to interfere with proper and continuous operation of the meter, provide monthly meter reporting, and allow XRMS internet connection to the press

f. Customer agrees to provide thirty (30) days written notice prior to relocation of the Equipment and to pay any charges associated with relocation of the Equipment.

g. Customer agrees to pay for equipment and software upgrades to current revision levels as deemed necessary by Xeikon America, Inc. prior to the commencement or renewal of this Agreement.

## 5. ATTACHMENTS

Xeikon America, Inc. attachments added to the Equipment shall NOT be automatically included within this Agreement (with the exception of Xeikon supplied unwinders, rewinders, stackers, and jogging tables) and shall be maintained for the additional service charges, if any, shown on Xeikon America's then-current rate schedule.

## 6. PAYMENT TERMS

All maintenance service charges, plus applicable taxes, are payable net upon receipt of invoice as follows:

a. **Monthly Charges** will be invoiced in advance at the designated billing frequency.

b. If Customer fails to pay any amounts due under this Agreement, Customer agrees to pay all costs of collection including reasonable attorneys' fees permitted by law.

c. Automatic annual renewals are subject to an increase that is aligned to an adjusted index for inflation and currency exchange. Said increase cannot exceed 4.0 % of the previous year's rate per period.

## 7. LIMITED WARRANTY

**REPAIR PARTS INSTALLED BY XEIKON AMERICA, INC. PURSUANT TO THIS AGREEMENT SHALL BE COVERED BY XEIKON AMERICA, INC.' PARTS WARRANTY IN EFFECT AT THE TIME OF INSTALLATION. THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS, IMPLIED OR STATUTORY; AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE HEREBY DISCLAIMED BY XEIKON AMERICA, INC. AND EXCLUDED FROM THIS AGREEMENT.**

## 8. LIMITATION OF LIABILITY

a. **XEIKON AMERICA, INC. SHALL NOT BE LIABLE FOR ANY DAMAGES CAUSED BY DELAY IN FURNISHING MAINTENANCE SERVICE OR ANY OTHER PERFORMANCE UNDER THIS AGREEMENT. THE SOLE REMEDY FOR XEIKON AMERICA, INC.' LIABILITY OF ANY KIND, INCLUDING NEGLIGENCE WITH RESPECT TO MAINTENANCE SERVICE PROVIDED UNDER THIS AGREEMENT, SHALL BE LIMITED TO REPERFORMANCE BY XEIKON AMERICA, INC. OF ANY DEFECTIVE MAINTENANCE SERVICE AND SHALL IN NO EVENT INCLUDE ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING, BUT NOT LIMITED TO, LOSS OF PROFITS, REVENUES, BUSINESS OPPORTUNITIES, OR INTERRUPTION OF BUSINESS), EVEN IF XEIKON AMERICA, INC. HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.**

b. No cause of action or claim arising out of the performance of services under this Agreement may be brought by either party more than eighteen (18) months after the cause of action accrues except that an action for non-payment may be brought within eighteen (18) months of the date of the last payment.

APPENDIX 0036

Certified Document Number: 80101689 - Page 14 of 16



## 9. FORCE MAJEURE

Xeikon America, Inc. shall be excused from and shall not be liable for any failure or delay in performance hereunder due to acts of God, accidents, fires, explosions, strikes, labor disputes, wars, failure or delays in transportation, governmental or judicial action affecting the terms of this Agreement or otherwise, shortages of labor, fuel, raw material or machinery, or any other cause beyond its or its suppliers' control.  In the event of such a contingency Xeikon America, Inc. shall only be excused for the duration of said contingency.

## 10. ASSIGNMENT

Neither this Agreement nor any interest herein is assignable or transferable by customer without the prior written consent of Xeikon America, Inc. such consent shall not be unreasonably withheld.

## 11. TERMINATION

This Agreement may be terminated by either party at the end of the Initial Term or any renewal term by providing written notice of termination to the other party at least ninety (90) days prior to the Annual Renewal Date.  Termination of this Agreement shall not relieve Customer of its obligation to pay all amounts accrued through the date of termination.  Modification of any Equipment by Customer will automatically terminate this Agreement as to such Equipment.  Any breach by Customer of its obligations hereunder, or under any agreement with Xeikon America, Inc. including failure of the Customer to pay when due any charges from Xeikon America, Inc. for the Equipment or maintenance service shall entitle Xeikon America, Inc. to either suspend service under this Agreement without terminating the Agreement, or to terminate this Agreement by providing Customer five (5) days written notice of termination.

## 12. RELOCATION

Xeikon America, Inc. requires prior written notice of relocation of the Equipment and Xeikon America, Inc. reserves the right to terminate this Agreement upon receipt of notice of relocation if, in Xeikon America, Inc.' opinion, the new location is not in a serviceable area, and Xeikon America, Inc. reserves the right to re-price this Agreement at current rates applicable to the new location. Customer's obligation to pay all charges hereunder during the time the Equipment is being relocated shall not be affected by the relocation of the Equipment.   If Xeikon America, Inc. is not providing relocation services, Xeikon America, Inc.' obligation to provide  maintenance services hereunder will be contingent upon Customer paying for an Equipment inspection after relocation and if necessary repair of any damage to Equipment caused by the relocation.

## 13. CHOICE OF LAW

This Agreement shall be deemed to have been made in Itasca, Illinois, regardless of the order in which the signatures of the parties shall be affixed, and the validity, performance and construction of this Agreement shall be governed by the laws of the State of Illinois without regard to its laws of conflicts.

## 14. SEVERABILITY

Should any provision of this Agreement be held invalid or unenforceable by any court of competent jurisdiction, the remaining provisions shall remain in full force and effect.

## 15. CAPTIONS

The captions contained herein are for descriptive purposes only and shall not be considered a part of this Agreement.

Certified Document Number: 80101689 - Page 15 of 16

APPENDIX 0037



## 16. GENERAL

This Agreement constitutes the entire agreement between the parties, supersedes all prior agreements and representations, whether oral or written, and may not be modified, amended or changed except by written agreement between the parties.   Any terms or conditions of any purchase order or other instrument issued by Customer which are inconsistent with the terms and conditions of this Agreement shall not be binding upon Xeikon America, Inc. and shall not apply to this Agreement.

This Agreement shall be binding upon the parties, their successors and assigns.

Customer
Initial: .....................................................
Date: 11/29/17 ...........................................

Certified Document Number: 80101689 - Page 16 of 16



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   June 26, 2018

Certified Document Number:        80101689 Total Pages:  16

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

APPENDIX 0039